IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IPCO, LLC d/b/a INTUS IQ,          )
                                   )
                    Plaintiff,     )
                                   )
        vs.                        )  Civil Action File
                                   )
TROPOS NETWORKS, INC.,             )
                                   )  No. 1:06-CV-00585-CC
                    Defendant.     )
                                   )
_____  )

**PLAINTIFF INTUS IQ'S RESPONSIVE *MARKMAN* BRIEF IN
SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTIONS**

**TABLE OF CONTENTS**

Page

I.   Introduction ................................................................................1

II.  Tropos' misapplication of the prosecution disclaimer doctrine .....................3

III. The Claim Terms in Dispute ...........................................................4

     A.   *"server"* ('062 Patent Claims 2-4, 6-8, 10-12, 14-16; '516 Patent
          Claims 1-9, 13) / *"client"* ('062 Patent Claims 2-4, 6-8, 10-12, 14-
          16; '516 Patent Claims 1, 5, 6, 8-11, 13-15, 17, 19) ............................4

     B.   *"gateway"* ('516 Patent Claims 1, 6, 10, 15-19) .................................7

     C.   *"transmission path"* ('062 Patent Claims 2, 10; '516 Patent Claims
          1, 5, 6, 10, 13-15, 17, 19) .....................................................9

     D.   *"a client link tree having client link entries"* ('062 Patent Claims 2,
          6, 10, 14) / *"map of [data packet] transmission paths"* ('516 Patent
          Claims 1, 13-15) ...............................................................12

     E.   *"housekeeping [functions/step]"* ('062 Patent Claims 6, 10, 14) .......15

     F.   Means-plus-function terms ...................................................18

          1.   Tropos' improper attempt to include "algorithms" .................18

          2.   *"server means …"* ('062 Patent Claim 6) ..........................19

          3.   *"means for maintaining a client link tree …"* ('062 Patent
               Claim 6) ......................................................................21

     G.   The terms at issue are readily understood by an ordinary artisan –
          not "insolubly ambiguous" ..................................................21

          1.   *"changing the transmission path…"* ('516 Patent Claims 1,
               6, 10, 15) / *"means for changing the transmission paths…"*
               ('516 Patent Claim 6) .......................................................22

          2.   *"means for sending said data packet to a proper location on
               said second network"* ('516 Patent Claim 6) ..........................24

          3.   "means for transmitting …with said header … to a client of
               said wireless network" ('516 Patent Claim 6) ..........................25

**TABLE OF AUTHORITIES**

**Page**

## CASES

*AccuScan, Inc. v. Xerox Corp.*,
    76 Fed. Appx. 290 (Fed. Cir. 2003)............................................................4, 6, 14

*Allvoice Computing PLC v. Nuance Comm'ns, Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007) ..........................................................................24

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ......................................................................3, 12

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ....................................................................18, 19

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
    423 F.3d 1296 (Fed. Cir. 2005) ............................................................................4

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,
    224 F.3d 1308 (Fed. Cir. 2000) ......................................................................9, 13

*Cordis Corp. v. Medtronic Ave, Inc.*,
    511 F.3d 1157 (Fed. Cir. 2008) ........................................................................3, 6

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ....................................................................21, 23

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009) ..........................................................................22

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001) ..........................................................................22

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002).............................................................................................6

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ..........................................................................20

*In re Katz*,
    639 F.3d 1303 (Fed. Cir. 2011) ........................................................18, 19, 20, 21

Page

*Masco Corp. v. U.S.*,
  303 F.3d 1316 (Fed. Cir. 2002) .........................................................................15

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ......................................................................3, 6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...........................................................13, 16, 20

*Plasmart Inc. v. Wincell Int'l Inc.*,
  No. 05 Civ. 10745(PKC), 2007 WL 3355509
  (S.D.N.Y. Nov. 8, 2007) .....................................................................................17

*Praxair v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008) ..........................................................................17

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) ....................................................................3, 5, 11

*Telecordia Techs., Inc. v. Cisco Sys., Inc.*,
  612 F.3d 1365 (Fed. Cir. 2010) .........................................................................18

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ...........................................................18, 21, 25

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ..............................................................................7

*Voda v. Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008) ..........................................................................17

## STATUTES, RULES AND REGULATIONS

35 U.S.C.
  §112(6)...............................................................................................................19

**Page**

## SECONDARY AUTHORITIES

U.S. PATENT AND TRADEMARK OFFICE
MANUAL OF PATENT EXAMINING PROCEDURES
§2111.03..........................................................................................................22

MICROSOFT COMPUTER DICTIONARY (5th ed. 2002)...................................8

## I.    Introduction

Several common themes permeate Tropos' response briefing and highlight their incorrect approach to claim construction.  In a blatant attempt to improperly secure non-infringement positions through this process, Tropos has: (1) grossly mischaracterized Plaintiff Intus IQ and the Patents-in-Suit; (2) misapplied basic tenets of claim construction principles; and (3) has "hid the ball" as to the critical terms at issue, resulting in prejudice to Intus IQ.

Tropos disingenuously claims that IPCO is "simply a patent holding company." Dr. Brownrigg developed the mesh networking technologies at the heart of the Patents-in-Suit in the 1990s – long before Tropos entered the wireless mesh space.  And as Tropos itself knows, David Petite's technology has been rolled out to millions of smart meters around the country.  As a result of IPCO's innovations, many of Tropos' competitors, including for example, Landis+Gyr, Trilliant Networks, General Electric, and Itron, Inc. took a license to IPCO's patents.  Meanwhile, Tropos has been willfully infringing IPCO's technology for many years, refusing to take a license.  Tropos' attempt to paint IPCO as a "patent holding company" is nothing more than an attempt to take advantage of IPCO's tremendously successful technology and shift the focus from Tropos' ongoing willful infringement.

Tropos goes on to mischaracterize the Patents-in-Suit by improperly reading in limitation after limitation from the file histories.  In so arguing, Tropos ignores the Federal Circuit's strict requirements for applying the doctrine prosecution history

disclaimer, instead arguing that essentially *any* statement from the file history constitutes a disclaimer, irrespective of the language of the claims and specification, whether there was an accompanying amendment, whether the statement was "clear and unmistakable," or whether the patentee was simply explaining the invention.  As shown below, Tropos file history disclaimer arguments do not hold water.

Tropos' failure to adhere to basic claim construction principles does not stop there.  Tropos goes on to invite other errors, by, for example, alleging certain terms are "insolubly ambiguous" in the face of clear evidence to the contrary.  The Patents-in-Suit were heavily examined not only during original prosecution, but again during reexamination.  *At no point* during these lengthy examinations did the examiner ever express difficulty in understanding these terms or even suggest that they could be indefinite.  Even Tropos has readily offered a construction for at least one of these terms, showing that it is susceptible to construction and therefore not "indefinite."

Finally, throughout this claim construction process, Tropos has "hid the ball" with respect to its claim construction positions, by, for example, initially identifying over fifty (50) terms for construction, disclosing a purported "expert" on the same day claim construction discovery closed, and disclosing its indefiniteness theories only days before the parties filed their Joint Statement.  As discussed in IPCO's Motion to Strike (Dkt. No. 156), this conduct has prejudiced IPCO and should not be condoned.

## II.     Tropos' misapplication of the prosecution disclaimer doctrine

There has been no prosecution disclaimer in this case. Under Federal Circuit precedent, prosecution disclaimer "requires that alleged disavowing actions or statements made during prosecution be both ***clear and unmistakable***."   *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003) ("prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage").   There is no "disavowal" where the applicant's statements simply "made explicit" what was already implicit in the patent.   *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) (finding no disclaimer because the file history simply "served the purpose of 'inform[ing] the meaning of the claim language by demonstrating how the inventor understood the invention'") (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc)).   Moreover, "[e]very statement made by a patentee during a prosecution to distinguish a prior art reference does not create a separate estoppel.   Arguments must be viewed in context."   *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 824 (Fed. Cir. 1992).

In spite of this clear direction from the Federal Circuit, Tropos insists on elevating statements from the reexamination file histories – statements taken out of context that fall far short of "clear and unmistakable" disavowals – over the patents' own claims and specifications.   This is improper.   The statements relied upon by Tropos fail to support their narrowing constructions, and often conflict with the patent

itself.   In so arguing, Tropos is attempting to improperly accelerate issues of infringement.  *See AccuScan, Inc. v. Xerox Corp.*, 76 Fed. Appx. 290, 291 (Fed. Cir. 2003) ("prosecution history estoppel does not apply to claim construction . . . or when there is no relevant amendment during prosecution of the patent application").

## III.   The Claim Terms in Dispute

### A.   *"server"* ('062 Patent Claims 2-4, 6-8, 10-12, 14-16; '516 Patent Claims 1-9, 13) / *"client"* ('062 Patent Claims 2-4, 6-8, 10-12, 14-16; '516 Patent Claims 1, 5, 6, 8-11, 13-15, 17, 19)

Tropos intentionally injects ambiguity into this otherwise straightforward claim language by inserting the term "in a client-server network."  In doing so, Tropos asks this Court to ignore the plain language of the claims and instead elevate peripheral evidence – such as non-binding statements from the file history, a prior art patent, expert opinion, inventor testimony, and even a dictionary definition – over the patent itself.  *See Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary that claim construction begins with, and remains focused on, the language of the claims.").

In so arguing, Tropos incorrectly applies the doctrine of prosecution history estoppel by alleging that IPCO "disclaimed" a peer-to-peer network (such as that of Jubin), and therefore must now be limited to a "client-server" network.  To be clear, Intus IQ never "disclaimed" every aspect of a peer-to-peer network.  A typical "client-server" network involves splitting processing between clients and the server, in which the clients only receive a service from the server.  In a typical peer-to-peer network, on

the other hand, all nodes act as "functional equals" and provide services to one another.  Elements of each type of network are **not**  mutually exclusive as Tropos proposes.  Declaration of Dr. Samir R. Das ("Das Decl."), ¶12 (attached hereto).  Here, the claims themselves define the "network" within which the claimed "server" and "clients" communicate, and describe the functionality of those elements.  *See, e.g.,* '062 Patent, Cl. 2 ("wherein said client process…initiates and selects a radio transmission path to said server").  While that network has characteristics of a typical client-server network (*e.g.*, where the server provides a "service" to the clients), the specification additionally describes how this is not to the exclusion of peer-to-peer network elements.  For example, "clients" can receive a service from one another (*see, e.g.,* '062 Patent at Col. 21, ll. 13-28 (describing the "pooning" process); '516 Patent, Col. 8, l. 66 – Col. 9, l. 5; Col. 10, ll. 56-58 (describing how clients issue "I am Alive" packets to other clients)), unlike a traditional client-server network.  Therefore it is improper – and contradictory to the intrinsic record – to narrow the claimed invention by incorporating the phrase "in a client-server network" as an attempt to exclude networks that have characteristics of **both** types of networks.

Moreover, the patentee distinguished the invention from Jubin on a **number** of different grounds – including that Jubin lacked "routing information" (Dkt. No. 155-6 at 33) and a server that "maintains a client link tree" (*Id.* at 31).  *Read Corp.*, 970 F.2d at 1824 (not every prosecution statement creates a separate estoppel).  In other words, Jubin was not distinguished solely because it used a peer-to-peer network, but because

the nature of the Jubin network would not allow for the sophisticated routing processes at the heart of the invention.  The patentee even made clear the term "peer-to-peer" network was used in a "purely descriptive fashion" to emphasize the differences between Jubin and the invention.  Dkt. No. 155-6 at 31, n.3.

The patentee's statements therefore do not constitute a "clear and unmistakable" disavowal of claim scope.  *Omega Eng'g, Inc.*, 334 F.3d at 1325-26.  The patentee simply "made explicit" what was already implicit in the patent by explaining his use of "server" and the "clients" as they already appeared in the claim language.  *Cordis Corp.*, 511 F.3d at 1177; Dkt. No. 155-6 at 31 (explaining the different functionality of the "clients" in relation to the "server").  Importantly, these statements were made without an accompanying amendment and the examiner never required the patentee to include "in a client-server network" directly into the claim language.[1]  *See AccuScan, Inc.*, 76 Fed. Appx. at 291.  In sum, the claim language controls and the terms "client-server" and "peer-to-peer" (which do not appear in the claims themselves) were used merely for explanatory purposes during reexamination and do not constitute claim limitations.

---

[1] Even if this Court finds there is some type of disclaimer, it is improper to force that disclaimer into this term's construction.  Under the doctrine of file wrapper estoppel, the patentee is simply precluded from invoking the doctrine of equivalents to recapture claim scope.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) (prosecution history estoppel may bar the patentee from asserting equivalents if the scope of the claims has been narrowed by amendment during prosecution).   Thus, the issue should be dealt with during the infringement stage of this litigation.

Tropos' reliance on other peripheral evidence is similarly unavailing. For example, Tropos relies on the McAlexander Declaration to support its erroneous conclusion that IPCO "disclaimed" a peer-to-peer network, but the cited portions of that Declaration show that he was simply describing dictionary definitions for "client/server architecture" and "peer-to-peer architecture." Dkt. No. 155-8 at 6.

Finally, Tropos' claim that because IPCO's construction of "client" would allow the client to use a service of another client would "improperly read on any client in the disclaimed peer-to-peer network" is incorrect and only further highlights Tropos' misunderstanding of the patents. The specification makes clear that within the context of the Patents-in-Suit, a client *can* communicate with and receive a "service" from another client. '062 Patent, Col. 21, ll. 13-28; '516 Patent, Col. 8, l. 66 – Col. 9, l. 5; Col. 10, ll. 56-58. Tropos' arguments to the contrary would therefore improperly read out a preferred embodiment.[2] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a construction that "excludes a preferred embodiment…is rarely, if ever, correct").

**B.     *"gateway" ('516 Patent Claims 1, 6, 10, 15-19)***

"Gateway" and "server" are distinct claim elements with different meanings.

---

[2]   Tropos also complains that IPCO's use of "equipment, program(s), and/or device(s)" is vague or unsupported by the specification. To the contrary, these are common terms that are well understood, even to a lay person. Further, the specification describes how software and/or hardware (*i.e.*, "programs" and devices") make up the clients and servers. *See, e.g.,* '516 Patent, Col. 13, ll. 23-29. Tropos complaints to the contrary lack merit. Brownrigg Tr. at 190, ll. 7-10 (claimed devices can be either "hardware, software, or  a combination of hardware and software")

Tropos' insistence that a "gateway" *must* be a server defies claim construction principles by conflating these distinct elements.   While a "server" can perform a "gateway" function, there is no requirement that it do so.   The basic function of a "gateway" is to facilitate communication between two networks.[3]   '516 Patent, Col. 5, ll. 50-54.   The basic function of a server, on the other hand, is to provide services to clients, as detailed in the claims.   '062 Patent, Cl. 2 ("server process further includes logic that maintains a client link tree having client link entries").   The patentee indicated the specialized "gateway" function in the specification: "[t]he server process includes…*performing a 'gateway' function* to another network…"   '516 Patent, Col. 5, l. 42.   The specification also describes the gateway being used *without* a server: "the construction and operation of the Internet and Intranets are well-known to those skilled in the art.   Likewise, routers, bridges, and other network devices such as hubs, *gateways* and Ethernet interfaces are well-known to those skilled in the art…."   '516 Patent, Col. 7, ll. 54-56; *see also*   MICROSOFT COMPUTER DICTIONARY 232 (5th ed. 2002) (defining "gateway" not as a server but a "device that connects networks…") Ex. A.

Importantly, there is no such "gateway" limitation in the '062 Patent claims. Tropos' attempt to conflate "server" and "gateway" is plainly improper as claim differentiation principles require the "server" to have a different meaning than

---

[3]   While certain claims (*e.g*., Cl. 15) detail additional functions that a gateway *may* perform, the basic meaning of a "gateway" stays the same and there is no need to incorporate detail into this construction that is already explicit in the claim itself.

"gateway." *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,* 224 F.3d 1308, 1317 (Fed. Cir. 2000) (distinct claim terms are presumed to have different meanings). The '062 Patent claims are illustrative: there, the claims cover a wireless network that includes a server, but no connectivity to a "second network," and thus ***no gateway***. Thus, a server clearly does not always include a gateway.

To be clear, the "gateway" and the "server" may be configured in various ways – and while a server may also include a gateway function – it does not follow that a gateway "***is***" a server, as Tropos contends. For example, the same computer may perform both server and gateway functions for the sake of cost saving or simplicity (*e.g.*, '516 Patent, Col. 5, ll. 40-43), or they may be separate devices (*e.g.,* '062 Patent, Cl. 2). Regardless of the precise configuration, the claims make clear that a "server" and "gateway" provide unique functions and require different constructions.

C. ***"transmission path"*** **('062 Patent Claims 2, 10; '516 Patent Claims 1, 5, 6, 10, 13-15, 17, 19)**

As used in the Patents-in-Suit, a "transmission path" is simply the route through which a packet travels. *See, e.g.,* '516 Patent at Col. 10, ll. 10-16; Col. 4, ll. 60-63. The claims themselves define the starting and ending points of the transmission path: "transmission path ***from*** the client ***to*** the gateway" ('516 Patent, Cl. 6); "transmission path ***to*** said server" ('062 Patent, Cl. 2). Tropos even appears to agree with this interpretation, as Tropos proposed the "compromise" construction of "the entire route through which the packet travels." Dkt. No. 155 at 10, n.21. While IPCO maintains

that this term need not be construed, should this Court deem construction necessary, IPCO is amenable to a similar construction, *i.e.,* "the route through which a packet travels."    Tropos' use of the term "entire" is unnecessary and injects potential ambiguity into the construction.    For example, the "entire" path could improperly include travel through the second network (*e.g.*, the Internet).    With respect to the '516 Patent, the specification nowhere contemplates the transmission path including such information; and the '062 Patent does not include a "second network" in the claims. IPCO therefore maintains that its own proposal – "the route through which a packet travels" – appropriately defines this term and would be readily understood by a jury.

Tropos' initially proposed construction – "the entire path from a client to a server" would add confusion and redundancy.    The specification makes clear that the transmission path is simply a route from a source to a destination, and the claims define that source and destination.    Inserting Tropos' confusing construction would result in nonsensical, confusing, and redundant claim language, for example:

- Claim 6 of the '516 Patent would read: "[the entire path from a client to a server] from the client to the gateway."

- Claim 15 of the '516 Patent would read: "where the [entire path from a client to a server] of a client to the gateway can be directly from the client to the gateway or indirectly to the gateway"

- Claim 2 of the '062 Patent would read: "clients initiates and selects a radio [the entire path from a client to a server] to said server"

In support of this erroneous construction, Tropos once again mischaracterizes the reexamination file history to support an improper narrowing construction that the

"transmission path" must be the "entire path from a client to a server."  In so arguing, Tropos mischaracterizes the patentee's statements that contain the words "complete" or "entire."  Dkt. No. 155 at 17.  Read in context, however, these statements merely explain how the path between two nodes, *e.g.,* nodes A and B, is the "entire" path between A and B.  *See, e.g.,* Dkt. No. 155-9 at 18-19 ("complete routing information from a first **node** to **another node**").   These statements in no way require that A must be a client, and B must be a server.[4]  Moreover, the patentee was responding to a rejection based on a combination of Kleinrock and another reference, Eng.  Thus, the patentee distinguished his invention from this combination on multiple grounds – *e.g.*, that Kleinrock did not require a gateway (Dkt. No. 155-10, ¶ 19); Kleinrock does not relate to wireless networks (*Id.*, ¶ 21) – each of which do not constitute a separate disclaimer.  *Read Corp.*, 970 F.2d at 824.  Furthermore, there was no accompanying claim amendment, further evidencing that the patentee was simply explaining what was already implicit in the patent.

---

[4]  To be clear, the patentee was simply distinguishing Kleinrock's "smaller routing tables" from the invention by explaining how the nature of the Kleinrock routing table did not necessarily allow for optimizing paths as disclosed by the invention: "Kleinrock also acknowledges that [longer path lengths] 'results in a degradation of network performance (delay-throughput) due to the excess internal traffic caused by longer path lengths.' [] Kleinrock, however, advocates that the benefits of significant table reductions in a very large network outweigh the disadvantages of optimized paths. []." Dkt. No. 155-9 at 19.  Thus, the patentee simply argued that Kleinrock did not disclose "a map of data packet transmission paths…," nor did Kleinrock disclose "optimiz[ing] the transmission paths…." *Id*.  Importantly, the patentee never "disavowed" a certain type of "transmission path," but rather explained that the nature of the Kleinrock routing tables in a very large network would not allow for the "optimization" of paths as disclosed by the invention.

Tropos' reliance on the Brownrigg Declaration is similarly unavailing.  There, Dr. Brownrigg simply reiterated the same concepts from the Office Action response: the goal of Kleinrock's "smaller" routing tables was to reduce routing table length; Kleinrock advocated these "smaller" routing tables to reduce the storage space required for those tables, at the expense of longer, less optimal paths.  Dkt. No. 155-10, ¶¶ 23, 24.  Dr. Brownrigg never "disavowed" scope regarding the transmission path; he simply explained how the goals of his invention differed from that of Kleinrock's.[5,6]

### D.   *"a client link tree having client link entries"* ('062 Patent Claims 2, 6, 10, 14) / *"map of [data packet] transmission paths"* ('516 Patent Claims 1, 13-15

As described in detail in Intus IQ's Opening Brief (Dkt. No. 154), these terms are straightforward and require no further construction.  *See* '062 Patent, Figs. 1a, 1b; Col. 9, l. 44 – Col. 10, l. 7; '516 Patent at Figs. 9a, 9b.

Instead of turning to the patents themselves for guidance on the meaning of these terms, Tropos skips straight over this critical intrinsic evidence and instead asks this Court to import limitations based on non-binding statements from the reexamination.   Specifically, Tropos improperly contends that the "link tree" and

---

[5]   Tropos also mischaracterizes statements from the '062 Patent reexamination in an attempt to support its erroneous proposal.  There, the patentee simply stated that the link tree includes information about "all of the clients **on the path**" – not all of the clients **in the network**.  Tropos' distorted reading of the file histories should be rejected.  *See Amgen Inc.*, 314 F.3d at 1327 (Fed. Cir. 2003).

[6]   While Dr. Belding accurately defines the transmission path as a "sequence of nodes along a path or route from a sending node to a receiving node" she goes on to improperly restrict the starting node to a "client" and the receiving node to a "server."

"map" must: (1) contain only **optimized** paths; and (2) include a path for **all** clients in the network.[7]  The intrinsic record does not support these limitations.  As an initial matter, the '062 Patent claims make no mention whatsoever of "optimization," and Tropos' attempt to include that limitation into "client link tree" is a plain violation of Federal Circuit precedent.  *Phillips*, 415 F.3d at 1320 ("one of the cardinal sins of patent law – reading a limitation from the written description into the claims."  Further, the '516 Patent specification explains that achieving optimization is one goal of the invention, but, due to the dynamic nature of the network environment, it is not a guarantee that each path is always "optimized."  Transmission paths are constantly updated (or "optimized") as conditions change or as clients enter or leave the network.  '516 Patent, Col. 4, ll. 39-48.  For example, clients can constantly "listen" for a more optimal path, but until they "hear" that path, they may have a less than optimal path to the server.  *Id.*, Col. 21, ll. 21-36.  Thus, the "map" may not always contain only "optimized" paths, as Tropos contends.

Tropos' citations to the '062 Patent reexamination do not change this result.  There, the patentee simply explained how the Jubin reference did not disclose a "client link tree" because it only contained "next hop" information.  The patentee certainly

---

[7]  "Client link tree" and "map…" are unique terms entitled to different meanings. *CAE Screenplates,* 224 F.3d at 1317.  While the terms may overlap in some ways, they appear in claims of different patents and are used uniquely in those claims.

never "disavowed" a link tree that could include less than optimal transmission paths.[8]
In fact, due to the dynamic nature of the invention's routing scheme, transmission paths are constantly changing, and thus the "link tree" may not always have the most current, "optimized" information. *See, e.g.,* '062 Patent, Col. 5, ll. 23-24 (clients "constantly search[] for improved paths"). The "link tree" may even store a back-up path, in case another path becomes inoperative. '062 Patent, Fig. 18; Col. 21, ll. 22-27. The claims themselves are instructive, as they make no mention of optimization.[9] Thus, while the link tree may certainly contain optimized paths as a result of the routing protocol, it is not a required claim element.

Furthermore, nowhere in the cited portions of the reexamination does the applicant state "clearly and unmistakably" that the link tree must include a path "for *each* client," as Tropos contends.[10] During the '062 Patent reexamination, the patentee simply distinguished the "tier tables" of Jubin (which include information regarding the next hop in a path) from the "client link tree" of the invention (which includes information about all hops on a *given* path). Dkt. No. 155-6 at 39. In fact, Tropos' position conflicts with the very nature of the invention, which provides for a dynamic

---

[8]   Moreover, the patentee spent several pages distinguishing Jubin from the invention on a multitude of grounds and not each and every distinguishing factor constitutes a "clear and unmistakable" disavowal of claim scope.

[9]   Certain claims expressly confirm the "dynamic" nature of the network. *See* '516 Patent, Cl. 15 ("digital controller dynamically updating the map").

[10]   It should further be noted that the patentee never made a narrowing claim amendment with respect to these terms, strongly suggesting that the patentee's statements simply explained the invention, rather than creating a "disavowal" of claim scope. *See AccuScan, Inc.*, 76 Fed. Appx. at 291.

system in which clients continuously enter and leave the system. Thus, the set of "each client of the network" is left undefined. *See* '062 Patent, Col. 11, ll. 37-55.[11]

Tropos' reliance on Dr. Elizabeth Belding is similarly unavailing. Dkt. No. 155, Ex. 4. Dr. Belding's testimony – along with all other evidence relied upon by Tropos – simply confirms that the ***intent*** of the invention is to optimize paths, but does not relate to what the client link tree (or map) actually represents.

**E.    *"housekeeping [functions/step]"* ('062 Patent Claims 6, 10, 14)** [12]

Tropos alleges that "housekeeping" has "multiple meanings"[13] and therefore the construction must be confined to a single example from the specification. That is not the case. Housekeeping is a well-understood term in the art with a straightforward meaning: to perform various maintenance operations in order to keep the network in good working order. In the networking context – just like in its traditional domestic sense – housekeeping consists of a multitude of activities, all having the common goal

---

[11]  Tropos' citations to the '516 Patent reexamination with respect to the "map" further fail to support Tropos' construction. As discussed in Part III.C ("transmission path"), the patentee was simply distinguishing the "smaller routing tables" of Kleinrock from the invention. Those statements have little bearing with respect to IPCO's proposed construction for map of "data structure containing a representation of one or more transmission paths."

[12]  With respect to the "housekeeping step," IPCO maintains that this term is not a step-plus-function limitation because it does not recite the requisite "step for" language. *See, e.g., Masco Corp. v. U.S.*, 303 F.3d 1316, 1327 (Fed. Cir. 2002).

[13]  In support of this contention, Tropos mischaracterizes Dr. Belding's and Dr. Brownrigg's testimony. Dkt. No. 155 at 25, n.33. While those individuals correctly recognized that housekeeping has a variety of meanings (*i.e.,* it can encompass multiple activities) – they did not find that housekeeping has multiple ***conflicting*** meanings requiring the Court to choose one of those meanings to the exclusion of others.

of maintaining good working order, or "cleaning up."  *See* Dkt. No. 154-7 at 10

("housekeeping" defined as "any of various routines, such as updating the clock or

performing garbage collection, designed to keep the system…in good working order");

*see also* Brownrigg Tr. (Dkt. No. 155-4) at 141, ll. 2-5 (reading dictionary definition of

"[a]ny instructions or routines…to help provide [] a more optimum computing

environment").  The specification describes a process of deleting inactive clients as

one potential "housekeeping" function, as well as other activities, such as "fast

searching."  *See* '062 Patent, Col. 16, ll. 61-63 (describing how conversion of trees to

strings allows for "fast searching and other housekeeping functions").

   Tropos improperly attempts to limit "housekeeping" to a single embodiment

from the specification into the claims in direct violation of Federal Circuit precedent.

*See Phillips*, 415 F.3d at 1323 ("although the specification often describes very

specific embodiments of the invention, we have repeatedly warned against confining

the claims to those embodiments").  Tropos erroneously characterized this example as

***the only*** type of housekeeping (it is not), on the basis that the patentee described it as

part of "the present invention."  Dkt. No. 155 at 19.  That argument is a nonstarter.

Notably, Tropos cites to only a single instance of the words "present invention," while

the claims and remainder of the specification make clear that the patentee did not

intend to limit the claim scope to a single example.  *See, e.g.*, '062 Patent, Abstract,

Fig. 4, element 80, Col. 13, l. 25 (repeatedly referring to "housekeeping functions" in

the plural, indicating an attempt to incorporate a variety of these maintenance-type

functions).   Thus, although patentees have used the "present invention" language to indicate to one of skill in the art that the patentee intends to limit the scope of the invention, that is simply not the case here.[14]

Tropos' proposal not only improperly narrows the term "housekeeping" but misinterprets the single example upon which it is based.   In that example, inactive clients (inactive for at least a threshold amount of time) can be purged from the tables and trees as a form of "clean-up" operation.   Because this process is a maintenance operation (hence the name "housekeeping") and not central to the routing, it may be interrupted during heavy traffic to conserve a node's processing resources.   '062 Patent, Col. 17, l. 34 – Col. 18, l. 5.   Tropos' proposal improperly ***requires*** that a client be deleted from the link tree.   That is not the case.   As illustrated in Figure 11, a client ***may*** be deleted from the link tree based on its time stamp.   *Id.*, Fig. 11, element 246; *see also* Brownrigg Tr. (Dkt. No. 154-9) at 197, ll. 7-9 ("Q: …in the housekeeping functions, a client isn't necessarily deleted; right? A: Not necessarily.").   Tropos' narrowing and improper construction should therefore be rejected.   To the extent this Court requires construction, this term should be construed consistently with the plain meaning of "housekeeping" and not limited to a single example from the specification.

---

[14]   *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1320-21 (Fed. Cir. 2008); *Praxair v. ATMI, Inc.*, 543 F.3d 1306, 1325-26 (Fed. Cir. 2008); and *Plasmart Inc. v. Wincell Int'l Inc.*, No. 05 Civ. 10745(PKC), 2007 WL 3355509, *7-8 (S.D.N.Y. Nov. 8, 2007) ("I do not read Verizon to mean that, when presented with magic words such as 'present invention' or 'the invention herein,' district courts should disregard contrary indications in the language of the claims, as well as other language of the specifications.").

### F.     Means-plus-function terms[15,16]

#### 1.     Tropos' improper attempt to include "algorithms"

Tropos repeatedly attempts to include unnecessary and overly limiting "algorithms" into each of its proposed structures for the means-plus-function terms. Federal Circuit law only requires an "algorithm" when the main corresponding structure is a general purpose computer that must perform complex functions, such as calculating slot-machine winnings based on a predetermined arrangement of symbols. *See, e.g., Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008).  The Federal Circuit has expressly found an algorithm is ***not*** required where the claimed functions are simple and can be performed by any computer.  *See, e.g., In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (finding no algorithm necessary where the claimed functions of "processing," "receiving," and "storing" could be performed by a general purpose computer without special programming); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011) ("usage 'algorithm' in computer systems has broad meaning"); *Telecordia Techs., Inc. v. Cisco*

---

[15]   The disputed '516 Patent means-plus-function terms include: "means for receiving a data packet from a client of said wireless network"; "means for converting said data packet to a format used in said [second network / wireless network]"; "means for sending said data packet to a proper location on said second network"; "means for receiving a data packet from said second network"; "means for transmitting said data packet with said header to a client of said wireless network"; and "means for changing the transmission paths of clients to optimize the transmission paths…."

[16]   With respect to the term "means for converting said data packet to a format used in said [second network / wireless network]" IPCO hereby revises its proposed structure to simply "a communication bridge, router, hub, or gateway, and their equivalents."

*Sys., Inc.,* 612 F.3d 1365, 1377 (Fed. Cir. 2010) ("need only disclose adequate defining structure to render the bounds of the claim understandable to an ordinary artisan").

The terms at issue here involve routine functions – such as "receiving," "converting," and "sending" – that can be performed by the devices identified by IPCO without the need for any special programming. *In re Katz* 639 F.3d at 1316. For example, all that is required to perform the function of "receiving a data packet from a client of said wireless network," is a simple radio modem. Das Decl., ¶19. Likewise, all that is required for "converting" the data packet is a device such as a bridge, hub, or gateway. *Id.*, ¶ 20. Thus, as will be discussed below, well-known, specialized devices, *e.g.*, radio modems, gateways, and interfaces, must simply perform the routine functions that they were designed to perform (*e.g.,* a radio modem must simply "receive" a wireless transmission) without the need for a specialized algorithm. Tropos' reliance on *Aristocrat* and its progeny is misplaced.

### 2.    *"server means …"* (**'062 Patent Claim 6**)

For purposes of narrowing the issues between the parties, IPCO concedes that this term is governed by 35 U.S.C. 112(6). The parties nonetheless disagree on the corresponding structure. The minimal structure necessary to perform the recited function is a radio modem, a router or bridge, and a processor, as IPCO has proposed. *See* '062 Patent, Col. 7, ll. 27-51; Das Decl., ¶18.

While the parties agree on much of the proposed structure, Tropos insists on including an "algorithm" in its proposed structure. In so arguing, Tropos urges this

Court to improperly apply Federal Circuit case law, under which an algorithm is not required where a special-purpose device (rather than a generic computer) must simply perform a routine function. *In re Katz*, 639 F.3d at 1316. Here, the structure identified by IPCO, which includes a "processor," as well as other narrowly-defined structures, need only perform straightforward "receiving," "sending," "communicating," and "housekeeping" functions – functions which can be performed by any computer without the need for a special "algorithm."

Tropos' proposal is over-inclusive and unnecessary. The five columns of "algorithms" identified by Tropos not only incorporate extraneous material, but unreasonably restrict the scope of this term. For example, the cited portions relate to other processes, not relevant to the recited function, such as "processing" packets ('062 Patent, Col. 13, ll. 28-54), adding clients ('062 Patent, Col. 15, ll. 34-44) and performing authentication ('062 Patent, Col. 15, ll. 14-34. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334-35 (Fed. Cir. 2004) (structures "not required for performing the claimed function" are "superfluous" to the analysis and do not serve as claim limitations). Further, the portions of the specification cited by Tropos describe only one exemplary housekeeping activity – deleting inactive clients – but ignore other maintenance-types of activities (*e.g.*, "fast searching") that can also be part of "housekeeping." [17] '062 Patent, Col. 16, ll. 61-63; *Phillips*, 415 F.3d at 1323.

---

[17]   Tropos claims that IPCO "ignores" the portion of this term reading "providing a server process including." That argument is a nonstarter. IPCO's proposal does not

### 3. *"means for maintaining a client link tree …"* ('062 Patent Claim 6)

Here again, Tropos misapplies Federal Circuit case law and insists on incorporating an algorithm into this claim term.  "Maintaining" a client link tree is akin to simply "storing" the link tree – a straightforward function that can be performed by any computer.  *In re Katz*, 639 F.3d at 1316.  Tropos' attempt to incorporate an algorithm into this construction is improper when all that is necessary is a digital controller configured with logic to perform this routine function.   Das Decl., ¶17; *Typhoon*, 659 F.3d at 1384 ("'algorithm' in computer systems has broad meaning").

### G. The terms at issue are readily understood by an ordinary artisan – not "insolubly ambiguous"

Tropos' claims that certain terms are indefinite are without merit.  The Patents-in-Suit have been heavily litigated and widely licensed to the leading technology companies in the industry.  More importantly, the Patents-in-Suit have been thoroughly examined by the USPTO and reexamined.  At no time has any Court or the USPTO found any term to be indefinite.  The patents are presumed valid, and Tropos ignores its heavy burden of establishing indefiniteness.[18]  *Datamize, LLC v. Plumtree Software,*

---

change the meaning of the claim and simply provides a concise function that would be clearly understood by a jury.

[18]   Although Tropos claims that it intends to file a summary judgment briefing on indefiniteness, any attempt by Tropos to do so is improper.  Tropos cannot have "two bites at the apple" by first consuming the Court's time and resources briefing these terms here, and then expecting to repeat that process during summary judgment briefing.  Thus, IPCO has attempted to address Tropos' tenuous "indefiniteness" arguments here.  To the extent Tropos is permitted further briefing on this topic, IPCO will fully respond to those arguments at the appropriate time.

*Inc.,* 417 F.3d 1342, 1348 (Fed. Cir. 2005) (burden of proving indefiniteness is by clear and convincing evidence); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001) (close questions of indefiniteness "are properly resolved in favor of the patentee").   Moreover, an ordinary artisan can readily understand these terms, defeating any notion that they are "insolubly ambiguous."

      1.     *"changing the transmission path…"* ('516 Patent Claims 1, 6, 10, 15) / *"means for changing the transmission paths…"* ('516 Patent Claim 6)

These phrases are readily understood by a person of ordinary skill in the art and do not require further construction.[19]  Das Decl., ¶¶ 13, 14, Att. 2, 3; *Exxon*, 265 F.3d at 1375 (definiteness satisfied where "one skilled in the art would understand the bounds of the claim when read in light of the specification").  Tropos and IPCO appear to *agree* in large part on a construction for "changing the transmission path…,"  as Tropos' proposal largely mirrors the claim language.  Dkt. No. 155 at 20.

Tropos' proposal improperly imports the limitation "by looking at the group" – attempting to *require* the use of all four of the listed factors each time the path is changed.  But the "group consisting essentially of" is a partially open group, and selection from that group can include one member, or a combination of members.  *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343-44 (Fed. Cir. 2009); MANUAL OF

---

[19]  IPCO hereby clarifies that it does not believe any construction is necessary for the phrase "changing the transmission path…"  To the extent the Court deems construction necessary for any subpart of this phrase, IPCO proposed constructions consistent with each subpart's plain and ordinary meaning.  Dkt. No. 154, Ex. C.

PATENT EXAMINING PROCEDURES § 2111.03.  Thus, changing the transmission path can be based on, for example, traffic *or* hops.  The claim language makes clear that the path can be changed by looking at just one member of the group and there is no requirement to "look at" the entire group.  *See, e.g.,* '516 Patent, Col. 9, ll. 6-24.

Tropos' claims of indefiniteness also lack merit.  Notably, Tropos itself is readily able to identify the meaning of this phrase – spending almost two pages explaining its own construction – showing that this term is far from "insolubly ambiguous."  *Datamize*, 417 F.3d at 1347.  Dr. Belding's claim that the specification only provides enough information to optimize based on "number of hops" ignores the teachings of the patent.  Dkt. No. 155, Ex. 4, ¶ 25.  Specifically, one of ordinary skill in the art would understand that the same programming logic described in the specification can be used to optimize based on any of the factors – *e.g.,* number of hops, speed, traffic, or robustness.  Das Decl., ¶13, Att. 2, 3.  In other words, even if such logic is described, for the most part, with reference to only one embodiment for the sake of simplicity (number of hops), an ordinary artisan would understand that such logic could be used to optimize for other factors, such as traffic or speed.  '516 Patent, Col. 9, ll. 19-24 (even if the present embodiment optimizes based on a single factor, "it will be appreciated…that multiple factors can be used to stabilize or optimize the wireless network system"); Das Decl., Att. 3, ¶6.  The patentee even explained this during reexamination:

As such, one skilled in the art would recognize that selecting a data transmission path based on number of hops (*i.e.*, passing through the least number of clients), robustness of the hops (*i.e.*, passing through the most robust clients}, traffic through the hops (*i.e.*, passing through clients with the least amount of traffic), delay at the hops (*i.e.*, passing through the fastest clients), or based on any other appropriate network metric…

Dkt. No. 154-8 at 7.

The term "means for changing…" is also readily susceptible to construction, as confirmed by persons of ordinary skill in the art.  Das Decl., ¶14, Att. 2, 3; Brownrigg Tr. 200-205, 208-209 (testifying that an ordinary artisan could develop a system whereby the path to the clients is through the fastest clients, most robust clients, and clients with the least amount of traffic).  Using the logic disclosed in the specification, an ordinary artisan would understand how to optimize paths using a variety of factors. *Allvoice Computing PLC v. Nuance Comm'ns, Inc.*, 504 F.3d 1236, 1244 (Fed. Cir. 2007) ("algorithms [] need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art").

**2.**      ***"means for sending said data packet to a proper location on said second network" ('516 Patent Claim 6)***

The structure necessary to perform this function is a network interface and a microprocessor configured to send a data packet.  *See, e.g.,* '516 Patent, Col. 7, ll. 37-61.  Tropos erroneously concludes that "no [] algorithm" is disclosed to support the function of sending a packet to a "proper location," largely by ignoring the teachings of the specification.  But no such algorithm is needed to perform this basic function. Das Decl., ¶15.  It is well understood in the art, and in light of the '516 Patent

specification, that data packets are sent with a "to" and "from" address as a matter of course.  *See, e.g.,* '516 Patent, Col. 14, ll. 14-22 ("As it will be appreciated by those skilled in the art, a data packet is an associated string of digital information…. The header includes…the destination address.").  The "destination" address allows the data packet to be sent to its "proper location" on the second network.  *See* Brownrigg Tr. at 206-207 (explaining how a person of ordinary skill would readily understand how to send a data packet to the "proper location.").  Dr. Belding's claim that "further detail" must be provided as to "*how* to send the data packet to the proper location" ignores the plain language of the claims, the patent's teachings, and fails to account for the skill of an ordinary artisan.  *Typhoon*, 659 F.3d at 1385 (Fed. Cir. 2011) ("amount of detail [required]…depends on the subject matter [] and its role in the invention as a whole, in view of the existing knowledge in the field of invention.").

### 3.    "means for transmitting …with said header … to a client of said wireless network" ('516 Patent Claim 6)

All that is required to "send" a data packet with its header is a radio modem.  *See, e.g.,* '516 Patent, Col. 5, ll. 54-56; Das Decl., ¶16; Brownrigg Tr. at 208 (explaining that a radio modem is all that is required to transmit a data packet).  Tropos' allegation that this term is "insolubly ambiguous" does not hold water.  Tropos misinterprets the claim language in contending that there must be an algorithm disclosed to "*attach* a header," which is not part of the recited function.

Respectfully submitted, this 22nd day of July, 2013.

ROBBINS GELLER RUDMAN
& DOWD, LLP


                    /s/ Jessica M. Kattula
_____
              Jessica M. Kattula

John C. Herman
    (Georgia Bar No. 348370)
Attorney-in-charge
Ryan K. Walsh
    (Georgia Bar No. 735190)
Jessica M. Kattula
    (Georgia Bar No. 414056)
3424 Peachtree Road, N.E.
Monarch Centre, Suite 1650
Atlanta, Georgia 30326
Telephone:  404-504-6500
Facsimile:  404-504-6501

Attorneys for Plaintiff
IP CO, LLC d/b/a Intus IQ

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1D, the undersigned counsel hereby certifies that the foregoing brief was prepared using 14-point Times New Roman font in accordance with L.R. 5.1.

/s/ *Jessica M. Kattula*
Jessica M. Kattula

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record who have consented to accept service of this document by electronic mail.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Jessica M. Kattula*
Jessica M. Kattula