IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IP CO., LLC, | CASE NO. 1:06-CV-0585 CC |
| Plaintiff, | |
| v. | |
| Tropos Networks, Inc., | |
| Defendant. | **JURY TRIAL DEMANDED** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT TROPOS NETWORKS, INC.'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
OF THE '516 PATENT BASED ON 35 U.S.C. § 112, ¶ 2**

# TABLE OF CONTENTS

**Page**

I.     FACTUAL BACKGROUND..................................................................2

      A.     "The Path To The Gateway Through The Most Robust Additional Clients".......................................................................2

      B.     Claim 6 of the '516 Patent....................................................4

II.     LEGAL STANDARD ...........................................................................5

      A.     Subjective Terms Are Indefinite ..........................................6

      B.     Failure To Disclose An Algorithm Renders A Computer-Implemented Means-Plus-Function Term Indefinite...........................7

III.     ARGUMENT........................................................................................8

      A.     Indefiniteness Is A Purely Legal Issue Suitable for Summary Judgment ...........................................................................8

      B.     The Claims Of The '516 Patent Include The Subjective Term "Most Robust" Without An Objective Anchor And Are Therefore Indefinite..............................................................8

           1.     The plain and ordinary meaning of "most robust" is subjective. ..................................................................9

           2.     The specification fails to provide an objective standard to determine the "most robust" path. ...........................10

           3.     The testimony of the inventor and experts from both parties confirms indefiniteness. .................................12

      C.     Claim 6 Of The '516 Patent Is Indefinite For Failure To Disclose Sufficient Structure For The Means-Plus-Function Elements ...........................................................................14

i

1.   The Means-Plus-Function Limitations of Claim 6 Must Disclose Sufficient Structure – *i.e.,* a Specific Algorithm for Performing the Recited Functions – to Meet the Requirements of 35 U.S.C. § 112, ¶ 2. ....................................15

2.   The Specification Discloses No Algorithm For Either "Sending Said Data Packet To A Proper Location On Said Second Network" Or "Transmitting Said Data Packet With Said Header To A Client Of Said Wireless Network" ................................................................................16

   a.   A bare statement that known techniques can be used does not disclose structure. ....................................17

   b.   IPCO's identification of corresponding structure confirms that the structure is insufficient to perform the recited function. ..........................................19

   c.   The inventor confirms that the algorithm necessary to perform the recited functions are not disclosed. ........20

3.   The Specification Fails To Disclose An Algorithm For "Changing The Transmission Paths To Optimize. . . So That The Path To The Gateway Is Chosen From The Group Consisting Essentially Of . . ."......................................21

   a.   The specification fails to disclose any algorithms clearly linked to identify the most robust, least traffic, and fastest paths.................................................22

   b.   IPCO's identification of corresponding structure confirms that the structure is insufficient to perform the recited function. ..........................................23

   c.   The testimony of the inventor and persons of ordinary skill in the art confirms that the algorithm necessary to perform the recited functions are not disclosed. ....................................................................23

IV.   CONCLUSION............................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F. 3d 1328 (Fed. Circ. 2008) ................................................................. passim

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir.), *cert denied*, 128 S. Ct. 653 (2007) ......................... 7, 19

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002) ................................................................... 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................. 6

*Datamize, LLC v. Plumtree Software*,
  417 F.3d 1342 (Fed. Cir. 2005) ................................................................. passim

*Halliburton Energy Services, Inc. v. M-I LLC*,
  514 F.3d 1251 (Fed Cir. 2008) ................................................................... 10

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
  341 F.3d 1332 (Fed. Cir. 2003) ................................................................ 6, 8

*In re Donaldson Co.*,
  16 F.3d 1189 (Fed. Cir. 1994) ................................................................... 16

*Selex Comm'n, Inc. v. Google, Inc.*,
  No. 1:09-CV-2927-TWT, 2013 WL 1412334 (N.D. Ga. April 8, 2013) ...... 12, 13

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
  236 F.3d 684 (Fed. Cir. 2001) ................................................................... 10

*VLT, Inc. v. Artesyn Techs., Inc.*,
  238 F. Supp. 2d 339 (D. Mass. 2003) ......................................................... 13

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) ................................................................. 7, 16

**STATUTES**

35 U.S.C. § 112 ¶ 2 ................................................................ 2, 5, 7, 15

35 U.S.C. § 112 ¶ 6 ............................................................... 2, 7, 15, 16

35 U.S.C. § 112(b) ...........................................................................5

35 U.S.C. §112(f) ...........................................................................15

**RULES**

FED. R. CIV. P. 56(C) ......................................................................6

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| IPCO | IP Co., LLC |
| Tropos | Tropos Networks, Inc. |
| '516 patent | U.S. Patent No. 6,249,516 (Dkt. 155-3) |
| Nguyen Decl. | Declaration of Lisa K. Nguyen in Support of Defendant Tropos Network, Inc's Motion for Summary Judgment of Invalidity of the '516 Patent based on 35 U.S.C. § 112, ¶ 2 |
| Ex. __ | Exhibit __ to the Nguyen Decl. |
| PBr. | Plaintiff Intus IQ's Opening *Markman* Brief In Support Of Its Proposed Claim Constructions (Dkt. 154) |
| DBr. | Defendant Tropos Network, Inc's Opening Claim Construction Brief (Dkt. 155) |
| JCCS | Joint Claim Construction and Prehearing Statement (Dkt. 151) |
| Belding Decl. | Declaration of Elizabeth Belding, Ph.D. Regarding Claim Construction (Dkt. 155-5) |
| Brownrigg Dep. | Transcript Excerpts from the June 18, 2013 Deposition of Dr. Edwin Brownrigg (Ex. 1) |
| Das First Decl. | Declaration of Samir R. Das, originally filed on June 1, 2010 in the case *IP Co., v. Sensus USA, Inc, et al.*, Case No. 09-0037-DF, United States District Court for the Eastern District of Texas (JCCS, Ex. C (Dkt. 151-3) at 21-26) |

Das Second Decl.

Second Declaration of Dr. Samir R. Das, originally filed on July 13, 2010 in the case *IP Co., v. Sensus USA, Inc., et al.*, Case No. 09-0037-DF, United States District Court for the Eastern District of Texas  (JCCS, Ex. C (Dkt. 151-3) at 27-29)

\* Emphasis added throughout unless otherwise indicated.

Each and every claim of the '516 patent is indefinite. Because the claims of a patent delineate the patentee's right to exclude, the patent statute requires that their scope be sufficiently definite to inform the public of what subject matter is covered by those exclusive rights. Here, the claims of the '516 patent are not sufficiently definite—each claim fails to provide fair notice to the public (including Tropos) as to what it purportedly covers.

First, each independent claim of the '516 patent includes the subjective term "most robust." IPCO expressly acknowledges (and, in fact, emphasizes in a misguided attempt to broaden the claim) that the determination of "most robust" is dependent on unspecified factors "including but not limited to factors such as: signal strength, battery life, link quality, and susceptibility to malfunctions." Thus, one engineer may consider the most robust path to be the path with the best signal strength, while another engineer may consider it to be the path with the best battery life. The '516 patent fails to disclose an *objective anchor* for a person of ordinary skill in the art to determine which of these paths is "most robust." Instead, the public is improperly left to guess the boundary of the claims.

Second, claim 6 of the '516 patent is invalid because it improperly uses functional language. When using functional language in a claim (also known as means-plus-function format), the patent statute requires the patent specification to

1

disclose and ***clearly link*** the function recited in the claim with specific structures and algorithms that perform those functions. Here, the '516 patent fails to provide the requisite structure and algorithms for these elements. This is underscored by IPCO's own construction which identifies "a microprocessor" alone without an algorithm to perform the recited function. The law is clear—the specification of a patent must disclose an algorithm where, as here, the recited function is implemented by a processor.[1] Because the specification of the '516 patent fails to disclose these algorithms (as demonstrated by IPCO's complete failure to identify any algorithms to perform the recited function), claim 6 of the '516 patent is invalid as a matter of law on these separate and independent grounds.

Accordingly, all of the claims of the '516 patent fail to meet the requirement of 35 U.S.C. § 112 ¶ 2, and are invalid as indefinite.

## I.   FACTUAL BACKGROUND

### A.   "The Path To The Gateway Through The Most Robust Additional Clients"

Each independent claim of the '516 patent recites:

changing [or changes] the transmission paths of clients to optimize the transmission paths including changing the transmission path from the client to the gateway so that the path to the gateway is chosen from the group

---

[1] *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification.")

consisting essentially of the path to the gateway through the least possible number of additional clients, ***the path to the gateway through the most robust additional clients***, the path to the gateway through the clients with the least amount of traffic, and the path to the gateway through the fastest clients.

Thus, each of the claims in the '516 patent includes the language "most robust."

During the claim construction process in the present case, the term "changing the transmission paths of clients to optimize . . . so that the path to the gateway is chosen from the group consisting essentially of . . ." was identified as a disputed term. JCCS, Ex A at 2, Ex. B at 16. While both parties agreed that the term should have its plain meaning, the parties offered competing constructions. Tropos construed the term to mean "choosing the transmission path to the gateway by looking at the group that includes at least: (1) the least-hop path, (2) the most-robust path, (3) the least-traffic path, and (4) the fastest path," qualifying that the term "most robust" is indefinite. Tropos Op. Br. at 14 n.27. IPCO chose not to construe the whole phrase and instead offered constructions for various subphrases including the following construction for "the path to the gateway through the most robust additional clients":

the path to the gateway through the most reliable clients or through the clients having the greatest ability to maintain communication under adverse conditions, including but not limited to factors such as: signal strength, battery life; link quality and susceptibility to malfunctions

JCCS, Ex. A at 2. In support of its construction, IPCO cited to three passages in the

3

patent and a dictionary definition.[2] IPCO Op. Br. at 15. Nowhere in this intrinsic or extrinsic "evidence" identified is signal strength, battery life, link quality or susceptibility to malfunctions referenced.

### B.     Claim 6 of the '516 Patent

Claim 6 of the '516 patent recites:

6. A server providing a gateway between a wireless network and a second network comprising:

[A] means for receiving a data packet from a client of said wireless network, means for converting said data packet to a format used in said second network, and ***means for sending said data packet to a proper location on said second network***; and

[B] means for receiving a data packet from said second network, means for converting said data packet to a format used in said wireless network, and ***means for transmitting said data packet with said header to a client of said wireless network***; and

[C] ***means for changing the transmission paths of clients to optimize the transmission paths includes changing the transmission path from the client to the gateway so that the path to the gateway is chosen from the group consisting essentially of*** [1] ***the path to the gateway through the***

---

[2] IPCO cites to the following: '516, 2:63-64 ("robustness (i.e. the ability to maintain communication with the network under adverse conditions)"), 9:15-20 ("Also, some radio links may be less robust or may be slower than other links, such that optimization may result in a routing of data around the less robust or slower links, even though it may increase the number of hops to the server 16."); 9:26-34 ("It should also be noted that the wireless network system 10 of the present invention is quite robust in that it will survive the loss of one or more clients of the system."); *Microsoft Press Computer Dictionary* 342 (2d ed. 1994) (Dkt. 154-7) (defining "robustness" as "soundness; the ability of a program to function, or to continue to function well in unexpected situations.").

> **least possible number of additional clients,** [2] **the path to the gateway through the most robust additional clients,** [3] **the path to the gateway through the clients with the least amount of traffic, and** [4] **the path to the gateway through the fastest clients.**

Elements [A] and [B] generally recite means for receiving, converting, and sending data packets between two networks. While the specification discloses detailed structures and algorithms for receiving and converting data packets from other networks,[3] the specification only discloses structure for sending **generally**—no structure is disclosed for sending a data packet to a **proper** location.

Element [C] recites a means for "changing the transmission path to optimize . . . so that the path . . . is chosen from the group consisting essentially of" the paths [C][1]-[4]. While the specification of the '516 patent discloses detailed algorithms for determining the shortest path—[C][1] the path to the gateway through the least possible number of clients—the specification discloses no algorithms for the most robust, least traffic, and fastest paths—paths [C][2]-[4].

## II.   LEGAL STANDARD

Under 35 U.S.C. § 112, ¶ 2,[4] a patent specification must "conclude with one

---

[3] *See, e.g.,* '516, 13:27-14:64, 3, 5, 5a-c (describing receiving data packets from another network), 7:62-8:16 (describing converting data packet formats from another network).

[4] As part of the America Invents Act, 35 U.S.C. § 112, ¶ 2 became 35 U.S.C. § 112(b), applying to all applications filed on or after September 16, 2012. The language of 35 U.S.C. § 112, ¶ 2 and 35 U.S.C. § 112(b) is the same.

or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Claims are properly held indefinite when those "trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003).

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because the question of whether a claim is indefinite is a pure issue of law, it is suitable for decision on summary judgment. *See* Fed. R. Civ. P. 56(c); *Datamize, LLC v. Plumtree Software*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

### A.      Subjective Terms Are Indefinite

"The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." *Datamize*, 417 F.3d at 1350. "[W]hen faced with a purely subjective phrase . . . a court must determine whether the patent's specification supplies some standard for measuring the scope of the phrase." *Id.* at 1351. "[T]he description of an embodiment provid[ing] examples" is insufficient. *Id.* The patent must "direct

those of ordinary skill in the art to a standard by which the appropriate comparison [can] be made." *Id.*

### B.    Failure To Disclose An Algorithm Renders A Computer-Implemented Means-Plus-Function Term Indefinite

Means-plus-function elements are statutorily limited to the "corresponding structure, material, or acts described in the specification and equivalents thereof. 35 U.S.C. § 112 ¶ 6. Section 112 ¶ 2 requires that the specification permit one of ordinary skill in the art to "know and understand what structure corresponds to the means limitation." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949-50 (Fed. Cir.), *cert denied*, 128 S. Ct. 653 (2007). "If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite." *Id.* at 950.  "[T]he structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function" from the point of view of a person of ordinary skill in the art. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). Thus, "[t]he structure of a microprocessor programmed to carry out an algorithm is limited *by the disclosed algorithm*." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999). "Merely stating that a standard microprocessor is the structure without more is not sufficient." *Aristocrat Techs.*, 521 F.3d at 1331.

7

## III.   ARGUMENT

### A.   Indefiniteness Is A Purely Legal Issue Suitable for Summary Judgment

The question of whether a claim is indefinite is a matter of law, drawn from the court's role as the construer of patent claims. *See Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). Tropos respectfully requests the Court hear its summary judgment motion for indefiniteness at the present time. Importantly, by resolving this issue now, the Court can almost certainly forego the burden and expense of construing the remaining terms of the '516 patent.

### B.   The Claims Of The '516 Patent Include The Subjective Term "Most Robust" Without An Objective Anchor And Are Therefore Indefinite

The term "most robust" is purely subjective, rendering each claim of the '516 patent indefinite. First, as evidenced by IPCO's own construction, the plain meaning of "most robust" varies based on the subjective design choices of the engineer implementing the system. Second, the claim language and specification fail to provide, or even suggest, any standard by which to determine "the path to the gateway through the most robust clients." Third, persons of ordinary skill in the art, including the inventor himself, in view of the '516 patent, have identified differing and even conflicting standards to determine the path through the "most robust" clients.  This confirms that the '516 patent fails to provide fair warning as

8

to the scope of its claims. The term "most robust" does not delineate the bounds of the claims of the '516 patent, and accordingly, must be found indefinite.

### 1. The plain and ordinary meaning of "most robust" is subjective.

There is no dispute that the standard by which a person of ordinary skill in the art can determine the "most robust" clients can vary. IPCO asserts "the path to the gateway through the most robust additional clients" to mean:

> the path to the gateway through the most reliable clients or through the clients having the greatest ability to maintain communication under adverse conditions, including but not limited to factors such as: signal strength, battery life; link quality and susceptibility to malfunctions

JCCS, Ex. A at 2. Setting aside the fact that the specification never once discusses "factors" used to identify the most robust path, IPCO's construction recognizes that the plain and ordinary meaning of the term provides no defined standard to determine "most robust." Rather, the standard is a design choice that can "includ[e] but [is] not limited to factors such as: signal strength, battery life, link quality and susceptibility to malfunctions." In other words, it is a "purely subjective standard held by any person who steps into the role of the system creator."[5]

IPCO argues that "Tropos itself has [] proposed a construction showing that this term is readily susceptible to construction and not indefinite" citing to

---

[5] *Datamize*, 417 F.3d at 1353.

*Datamize, LLC v. Plumtree Software, Inc.* IPCO Op. Br. at 16. This is incorrect. While Tropos proposed a construction for the larger "changing the transmission path . . ." phrase, Tropos did not propose a construction for the term "most robust" itself. Regardless, *Datamize* expressly recognized that the ability to construe a term does not preclude indefiniteness. "[E]ven if we adopted a completely subjective construction . . . this would still render the [] patent invalid." *Id* at 1350. In fact, in *Halliburton Energy Services, Inc. v. M-I LLC*, the Federal Circuit specifically stated that "[t]he fact that [the patent holder] can articulate a definition supported by the specification . . . , does not end the inquiry. Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." 514 F.3d 1251 (Fed. Cir. 2008) (finding the term "fragile gel" indefinite); *see also Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001) (finding the term "comparing" indefinite when it "could undoubtedly have other meanings to a person of skill in the art.").

## 2. The specification fails to provide an objective standard to determine the "most robust" path.

There is no objective standard to determine the "most robust" path disclosed in the specification of the '516 patent. In fact, the term "robust" is used only a handful of times in the specification, generally as an adjective to describe "robust"

10

networks or links.[6] As IPCO's construction acknowledges, this ability can be determined by one or more unspecified factors including signal strength, battery life, link quality, and susceptibility to malfunctions. The specification fails to identify any factors, let alone a standard, to determine robustness.

The '516 patent plainly falls short of providing the guidance necessary to transform the term "most robust" into a definite term. Courts have routinely rejected specifications with far greater detail and guidance. In *Datamize, LLC v. Plumtree Software, Inc.*, the Federal Circuit found the term "aesthetically pleasing" indefinite because it failed "to provide any direction to one skilled in the art attempting to determine the scope of the claimed invention." *Id*. at 1352. In doing so, the Federal Circuit noted that the specification had "indicate[d] particular aspects of the screen that might affect whether the screen is 'aesthetically pleasing': button styles, sizes, and placements, window borders, color combinations, and type fonts." *Id.* But the patent failed to disclose "how to determine what button styles, sizes, and placements, for example, are 'aesthetically pleasing'" and "provide[d] no guidance to a person making aesthetic choices such that their choices [would] result in an 'aesthetically pleasing' look and feel." *Id*

---

[6] *See, e.g.,* '516, 4:41-42 ("a packet-based wireless network that is both robust and efficient"), 4:19-20 ("a wireless network that is both robust and efficient"), 9:16-17 ("some radio links may be less robust").

Thus, the Federal Circuit found that the claim term lacked an "objective anchor" and was indefinite as a matter of law. *Id.* at *1350-51, 1356.

In the recent case *Selex Comm'n, Inc. v. Google, Inc.*, the plaintiff attempted to provide an objective anchor to the subjective term "high cost number" by pointing to language in the specification such as "roaming charges, high long distance charges, and high local charges" as examples of high cost numbers. No. 1:09-CV-2927-TWT, 2013 WL 1412334, *8 (N.D. Ga. April 8, 2013). This Court found, however, that these "purported anchors" were insufficient to make the claim term definite. *Id.* at *14. While the specification listed examples, the examples did not provide "objective parameters" as to how to determine whether a cost was high. *Id.* Thus, this Court found the claim language indefinite as subjective. *Id.*

Unlike the patents in *Datamize* and *Selex*, the specification here provides no examples.[7] Thus, because there is no "objective anchor" for the term "most robust" anywhere in the patent, the term must be found indefinite.[8]

### 3.   The testimony of the inventor and experts from both parties confirms indefiniteness.

IPCO argues that because the claims of the '516 patent "were considered

---

[7] IPCO argues that "[t]he specification provide[s] ample guidance as to those criteria, and the claim is not indefinite." IPCO Op. Br. at 16. Notably, IPCO does not provide any citations in support of this statement.

[8] *See Datamize*, 417 F.3d at 1351.

and allowed" by the examiner, who is "presumed to act from the viewpoint of an ordinary artisan," the claims of the '516 patent are definite because they "can be readily understood by an ordinary artisan." IPCO Op. Br. at 16. This argument is nonsensical. Taking IPCO's argument to its logical conclusion, no issued patent could ever be challenged based on indefiniteness.

Regardless, the "subjective assessment of a person skilled in the art cannot render a claim definite." *Selex*, 2013 WL 1412334, *8. This is particularly true where, as here, persons of ordinary skill in the art have confirmed that there are different, and in fact conflicting, standards to determine the "most robust" clients.[9] Specifically, IPCO's expert Dr. Samir Das opines that "[a] person of ordinary skill in the art would understand that factors affecting robustness, within the context of the '516 Patent would include: signal strength; battery life; link quality; and susceptibility to malfunctions." Das First Decl. ¶ 12. Such factors "can relate to both the hardware or software resident on the client itself; as well as network conditions, such as the location of the client in the network." Das Second Decl. ¶ 7. In other words, as Tropos' expert Dr. Elizabeth Belding explains, "[t]he path to the

---

[9] *See VLT, Inc. v. Artesyn Techs., Inc.*, 238 F. Supp. 2d 339, 342 (D. Mass. 2003) ("[A] claim term is indefinite if it can have more than one meaning to a person of ordinary skill in the art, and the appropriate meaning of the term is not explained in the specification.").

gateway through the 'most robust additional clients' could be one of many different paths." Belding Decl. ¶ 25.

Further, during his deposition, the inventor Dr. Brownrigg testified that a system based on the "most robust" clients would rely on shortest path:

> Q So in the context of your patent, when you say 'optimize for the most robust clients,' it would be for the shortest path?
> . . .
> THE WITNESS: Yes.

Ex. 1 (Brownrigg Dep.) at 134:3-19. This conflicts with the specification which states that "optimization may result in a routing of data around the less robust or slow links, even though it may increase the number of hops to a server 16." '516, 9:17-20. "Reference to undefined standards, regardless of whose views might influence the formation of those standards, fails to provide any direction to one skilled in the art attempting to determine the scope of the invention"—a construction "cannot depend on the undefined views of unnamed persons, even if they are experts, specialists, or academics." *Datamize*, 417 F.3d at 1352-53.

The '516 patent is devoid of any objective anchor that gives meaningful guidance to determine "the path to the gateway through the most robust additional clients." Each claim of the '516 patent is therefore indefinite as a matter of law.

**C.    Claim 6 Of The '516 Patent Is Indefinite For Failure To Disclose Sufficient Structure For The Means-Plus-Function Elements**

14

Claim 6 of the '516 patent recites two means-plus-function elements for sending information to a specific location in another network: "means for sending said data packet to a proper location on said second network" and "means for transmitting said data packet with said header to a client of said wireless network." Additionally, claim 6 recites a "means for changing the transmission paths to optimize the transmission paths . . . " Because these elements are "means-plus-function" limitations and the '516 patent fails to disclose adequate structure, and specifically algorithms, for performing the claimed functions, claim 6 is indefinite pursuant to 35 U.S.C. § 112, ¶ 2.

1.   **The Means-Plus-Function Limitations of Claim 6 Must Disclose Sufficient Structure – *i.e.,* a Specific Algorithm for Performing the Recited Functions – to Meet the Requirements of 35 U.S.C. § 112, ¶ 2.**

There is no dispute that these terms are means-plus-function elements. JCCS, Ex. A at 5-6, Ex. B. at 26, 29-31. Under § 112 ¶ 6,[10] applicants that elect to use the means-plus-function format do not have to disclose structure in the claims themselves, nor are they limited solely by the structure included in the claims. But to gain the benefit of this bargain, the patent's "specification must clearly associate the structure with performance of the function." *Id.* Failure to do so results in indefiniteness under 35 U.S.C. § 112, ¶ 2. *See In re Donaldson Co.*, 16 F.3d 1189,

---

[10] Now, after the America Invents Act, 35 U.S.C. §112(f).

1195 (Fed. Cir. 1994).

In cases involving computer-implemented inventions, as here, the specification must further disclose a *specific algorithm* to perform the claimed function. "In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer *programmed to perform the disclosed algorithm*." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). "Merely stating that a standard microprocessor is the structure without more is insufficient." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F. 3d 1328, 1331 (Fed. Circ. 2008). "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Id.* at 1333. Because IPCO seeks the benefits of means-plus-function claiming, it must fulfill its end of the bargain by disclosing a specific algorithm in the specification.

> **2.     The Specification Discloses No Algorithm For Either "Sending Said Data Packet To A Proper Location On Said Second Network" Or "Transmitting Said Data Packet With Said Header To A Client Of Said Wireless Network"**

There is no structure clearly linked in the specification to the functions of "sending said data packet to a proper location on said second network" or

"transmitting said data packet with said header."[11] Although the specification

discloses structure to send data *generally*, it fails to disclose structures to send data

to a *proper* (or specific) location. This is confirmed by IPCO's own construction

and the testimony of the inventor. Accordingly, these means-plus-function

limitations are indefinite.

> a. **A bare statement that known techniques can be used does not disclose structure.**

While the specification discloses the use of headers and routing tables to

receive data packets, these structures are associated with the functions "receiving

data packets from a client of said wireless network" and "receiving a data packet

from said second network."  In contrast, there is nothing in the specification that

clearly links these structures to the functions "sending said data packet to a proper

location on said second network" or "transmitting said data packet with said header

to a client of said wireless network."

The process of receiving data packets is shown in Figure 5 and 5a-5c. In

describing those figures, the specification explains that "a data packet is an

associated string of digital information that is transferred and processed as a unit."

'516, 14:17-18. The data packet includes a header with "the source address, the

---

[11] The parties do not dispute the recited functions. JCCS, Ex. A at 5-6, Ex. B at 26, 29-30.

17

address of all hops along the way (i.e., the 'link' of the data packet), and the destination address." *Id.*, 14:20-22. Using this information the server determines "whether the packet being received by the server was intended for that server." *Id.*,13:45-46.

The specification includes no parallel description for sending data packets to another network. Rather, the specification provides that "the step 76 'Send Packets' simply involves sending the data packets stored in the client transmit buffer to the network 10 through the radio modem 62," providing no other detail as to ***how*** data packets are sent to another network other than stating that "[t]he 'Send Packets' . . . process[] will be easily understood by those skilled in the art." *Id.*, 17:31-40. Indeed, IPCO implicitly admits that this is the only passage in the specification that discloses anything close to sending a data packet to a "proper location" on the second network—it is the only part of the specification IPCO cites for its construction, stating that the passage describes the "'send packets' step as straightforward and readily understood by an ordinary artisan." IPCO Op. Br. at 22. But such "a bare statement that known techniques or methods can be used does not disclose structure, " and it is precisely this non-disclosure that renders the claim invalid. *Biomedino,* 490 F.3d at 95 (affirming indefiniteness of the term "control means" where specification only disclosed a black box).

> **b.** **IPCO's identification of corresponding structure confirms that the structure is insufficient to perform the recited function.**

IPCO identifies the corresponding structure for these elements as follows:

| "means for sending said data packet to a proper location on said second network" |
| --- |
| a network interface and a microprocessor configured to send a data packet and its equivalents |
| "means for transmitting said data packet with said header to a client of said wireless network" |
| a radio modem and its equivalents |

IPCO's identification of corresponding structure underscores the fact that the disclosed structures are insufficient.

First, while "sending" and "transmitting" are the same, IPCO oddly identifies different structures for the functions "sending said data packet to a proper location on said second network" and "transmitting said data packet with said header to a client of said wireless network." With respect to the former, IPCO identifies a microprocessor as part of the corresponding structure, admitting that the system "uses a microprocessor to send a data packet to a 'proper location' on the second network." IPCO Op. Br. at 22. But for the latter, IPCO only identifies the radio modem for "transmitting a data packet" ignoring the second part of the function "with said header to a client of said wireless network."[12] *Id.* at 24. As

---

[12] IPCO cites to inventor Dr. Brownrigg's testimony that a "radio modem would be

IPCO admits, in order to transmit a data packet to a client of said wireless network—*i.e.,* send a data packet to a "proper location" on a second network—a microprocessor is necessary.

Second, IPCO does not identify a mere microprocessor, but a microprocessor "configured to send a data packet." In other words, IPCO acknowledges that the microprocessor needs to be programmed with an algorithm—one which IPCO does not (because it cannot) identify. The bald identification of a "configured" microprocessor is plainly insufficient. Under Federal Circuit precedent, an algorithm must be disclosed to perform the recited function. *Aristocrat*, 521 F.3d at 1333.

### c.     The inventor confirms that the algorithm necessary to perform the recited functions are not disclosed.

In the system of the '516 patent, in order to send a data packet to a proper location on a second network, certain steps must be taken. None of these steps are disclosed in the specification. During deposition, inventor Dr. Brownrigg explained that in order to send a data packet to a specific location, a client first must request certain information from the server:

---

the minimum hardware requirement" in order to "transmit a data packet." IPCO Op. Br. at 24 n.17.  This testimony is inapposite since it ignores the latter half of the recited function.

Q . . . to send a data packet to the proper location in the system described in your patents, a client would have to request the tree from the server before it could send to the proper location?
. . .
THE WITNESS: The client would have to request certain information available from the tree.

Ex. 1 (Brownrigg Dep.) at 129:4-130:16. Dr. Brownrigg further explained that data

packets could be sent with or without the header:

Q In the system described in your patent, you can or cannot - or you may or may not have a header, it doesn't matter in the system of your patents?
. . .
THE WITNESS: Suffice it to say that to the extent possible, any given client knows the optimal route to a server.

*Id.* at 128:20-129:5.

The specification does not disclose what information is necessary to send a

data packet to a proper location in the second network, let alone where or how that

information is obtained. Dr. Brownrigg's testimony acknowledging that certain

steps must be taken in order to send a data packet to a specific location in another

network confirms that the specification fails to disclose these algorithms.

> **3.    The Specification Fails To Disclose An Algorithm For "Changing The Transmission Paths To Optimize. . . So That The Path To The Gateway Is Chosen From The Group Consisting Essentially Of . . ."**

Claim 6 also recites:

means for changing transmission paths of clients to optimize the transmission paths including changing the transmission path from the client

> to the gateway so that the path to the gateway is chosen from the group consisting essentially of [1] the path to the gateway through the least possible number of additional clients, [2] the path to the gateway through the most robust additional clients, [3] the path to the gateway through the clients with the least amount of traffic, and [4] the path to the gateway through the fastest clients

This limitation recites the function "changing the transmission path to optimize . . . so that the path . . . is chosen from the group consisting essentially of" the paths [1]-[4]—the shortest, most robust, least traffic, and fastest paths. Thus, for this limitation to be found definite, the specification, at a minimum, must disclose an optimization algorithm for identifying each of these paths. It does not.

### a.   The specification fails to disclose any algorithms clearly linked to identify the most robust, least traffic, and fastest paths.

"FIGS. 2a-2g, 2h'-2h'', and 2i-2o, are used to describe . . . path optimization processes of the present invention." '516, 6:43-44. The algorithms disclosed in these figures are the only optimization processes described in the '516 patent, and identify the "better (i.e. shorter) path to the server." '516, 11:37-38. There are no algorithms disclosed that identify the most robust, least traffic, or fastest paths.

Rather, the disclosure of an optimization process to identify the most robust, least traffic, or fastest paths is limited entirely to this short passage:

> For example, the ***traffic*** of data packets through a particular client modem may be large, such that it is better to route the data from neighboring clients through other clients, even though there may be more hops involved with

> this alternative routing. Also, some radio links may be ***less robust*** or may be ***slower*** than other links, such that optimization may result in a routing of data around the less robust or slower links, even though it may increase the number of hops to the server 16.

'516, 9:12-19. This passage acknowledges that an optimization process that can identify the most robust, least traffic, and fastest path can be implemented. But the passage does not disclose how this process is done. In other words, no algorithm is disclosed. As such, this means-plus-function limitation is indefinite. *Aristocrat*, 521 F.3d at 1333.

### b.   IPCO's identification of corresponding structure confirms that the structure is insufficient to perform the recited function.

IPCO acknowledges that the microprocessor must be "configured with logic"—*i.e.*, programmed with an algorithm. As discussed, *supra*, simply identifying a "configured" microprocessor is insufficient. An algorithm must be identified. *Aristocrat*, 521 F.3d at 1333.

### c.   The testimony of the inventor and persons of ordinary skill in the art confirms that the algorithm necessary to perform the recited functions are not disclosed.

A person of ordinary skill in the art, reading the disclosure of the '516 patent, would understand that the sole algorithm disclosed to optimize is a tree sorting algorithm that can only be used to identify the shortest path—this algorithm

cannot be used to identify the most robust, least traffic, or fastest paths. As Dr.

Belding explains:

> While one of ordinary skill in the art would understand the meaning of "the path to the gateway through the least possible number of additional clients" is the least-hop path based on the specification of the '516 patent, ***the other paths are not contained in the optimization algorithm described*** in the '516 patent. The tree structure described in the '516 patent (see, e.g., 1a-b, 9a-b) is a representation of the number of hops between the nodes. Accordingly, the optimization algorithm described in the '516 patent, which is based on this tree structure, ***is intended to optimize only for path length***. The optimization algorithm is not described for any other use and ***is insufficient to describe*** to one of ordinary skill in the art how to implement a system that ***optimizes based on robustness, traffic, or speed.***

Belding Decl., ¶ 25. Thus, Dr. Belding confirms that the only algorithm described

in the patent to optimize identifies the shortest path, and not the most robust, least

traffic, or fastest paths.

The inventor corroborates this understanding. First, as discussed, *supra*, with

respect to the term "most robust," the inventor confirms that there is no objective

standard to determine the most robust path, let alone an algorithm disclosed in the

patent.  *See* Section III.B.3. Indeed, to the extent that there is a "most robust" path

disclosed in the '516 patent, Dr. Brownrigg testifies that it is the shortest path:

> Q So in the context of your patent, when you say 'optimize for the most robust clients,' it would be for the shortest path?
> . . .
> THE WITNESS: Yes.

24

Ex. 1 (Brownrigg Dep.) at 134:3-19. Second, the inventor confirms that "traffic" is

irrelevant to the algorithms disclosed in his patent:

> Q Do your patents describe a way to optimizing using traffic.
> . . .
> THE WITNESS: Traffic within a network that I describe in my patents is irrelevant to the function of the client-server network architecture.

*Id.* (Brownrigg Dep.) at 125:11-17. Third, the inventor discloses an algorithm

necessary to determine fastest path which is discussed nowhere in the patent:

> Q If I asked you to implement a system to optimize based off of the fastest clients, how would you implement such a system?
> . . .
> THE WITNESS: First of all, I'd have to identify the fastest nodes.
> . . .
> Q What would you do with the information after you identify the fastest nodes?
> . . .
> THE WITNESS: If I -- if a given client discovered a route through another client that had a finite number of hops, and there was a plurality of such other nodes, then the client would attempt to determine the speed of the route by issuing a loopback command, and in my patents, a loopback takes more than one second, then that particular route is deemed by my patents to be too slow.

*Id.* (Brownrigg Dep.) at 135:6-24. The specification does not disclose an algorithm

to optimize by identifying the most robust, least traffic, and fastest paths, and

therefore this limitation is invalid.

## IV.   CONCLUSION

For the foregoing reasons, all the claims of the '516 patent are indefinite.

Dated: July 22, 2013                    Respectfully submitted,


                                        */s/ Bryan G. Harrison*
                                        Bob Steinberg
                                        LATHAM & WATKINS LLP
                                        355 South Grand Avenue
                                        Los Angeles, CA 90071
                                        Telephone: (213) 891-8989
                                        bob.steinberg@lw.com

                                        Richard G. Frenkel
                                        Lisa K. Nguyen
                                        LATHAM & WATKINS LLP
                                        140 Scott Drive
                                        Menlo Park, CA 94025
                                        Telephone: (650) 470-4848
                                        rick.frenkel@lw.com
                                        lisa.nguyen@lw.com

                                        Bryan G. Harrison
                                        Morris, Manning & Martin, LLP
                                        1600 Atlanta Financial Center
                                        3343 Peachtree Road, N.E.
                                        Atlanta, Georgia 30326
                                        Telephone: (404) 233-7000
                                        Fax: (404) 365-9532

                                        *Attorneys for Defendant*
                                        *Tropos Networks, Inc.*

26

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1D, the undersigned counsel hereby certifies that the foregoing brief was prepared using 14-point Times New Roman font in accordance with L.R. 5.1.

/s/ Bryan G. Harrison
Bryan G. Harrison
Georgia Bar No. 331750

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system this 22nd day of July 2013.

/s/ Bryan G. Harrison
Bryan G. Harrison
Georgia Bar No. 331750